

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–15–416

|  |  |
|---|---|
| MICHAEL A. TANNER<br>APPELLANT<br><br>V.<br><br>JENNIFER GREGERSEN<br>APPELLEE | Opinion Delivered November 4, 2015<br><br>APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. DR–2009-671]<br><br>HONORABLE THOMAS M. HUGHES, JUDGE<br><br>AFFIRMED |

**BRANDON J. HARRISON, JUDGE**

Michael Tanner appeals the circuit court's order finding him in criminal contempt. He argues that he did not violate the court's order and that the court's sentence of thirty days' imprisonment was excessive. We affirm.

The parties in this case were divorced in March 2010 and awarded joint custody of their two minor children, twelve-year-old M.T. and seven-year-old N.T. Disagreements arose, and both parties filed petitions for modification of the decree and for contempt. After a hearing on 12 March 2015, the circuit court entered an agreed order on 2 April 2015 that acknowledged M.T.'s desire to reside with her mother but ordered alternate weekly visitation with N.T. The order specified that exchanges for visitation would occur on Mondays, and that during the school year, one party would conclude his or her visitation by dropping N.T. off at school, and the other party would commence his or her visitation by picking him up from school.

SLIP OPINION

One day later, on April 3, Gregersen filed an emergency petition for Tanner to return N.T. to her custody, alleging that she was unable to commence her visitation on Monday, March 30 because N.T. was not at school that day, nor was he at school on March 31, April 1, or April 2. According to Gregersen, she contacted Tanner on the afternoon of March 30, and Tanner informed her that N.T. was ill. Tanner had since refused to return N.T. to her custody. On April 6, Gregersen filed a verified motion for contempt, alleging that since the entry of the agreed order, Tanner had "willfully and intentionally violated the orders of this Court." Gregersen requested an order to show cause, the "immediate incarceration of Defendant," and $2500 in attorney's fees.

On April 8, Tanner filed a petition for suspension of custodial periods and a request for an emergency hearing. He alleged that he took N.T. to baseball practice on March 19, which was during Gregersen's week of visitation, and that he met Gregersen in the Harps parking lot after practice. Tanner claimed that he was "aware that the Plaintiff's driver's license had been suspended," so he "called the local police department to verify if the Plaintiff had a valid driver's license before releasing the minor child into her care and custody." Tanner stated that when the police arrived, Gregersen left the parking lot "at a high rate of speed." He further claimed that N.T. told him and his wife that Gregersen "drank alcohol daily," "would drink beer while driving with the minor children," and gave N.T. a "white pill" to help him sleep. According to Tanner, N.T. was "fearful of returning to the Plaintiff's home." Tanner took N.T. to see a medical doctor, Dr. Joanna Wilson, on April 3 and a psychologist, Dr. Kenneth Counts, on April 6. N.T. was subsequently excused from school from March 30 to April 3 by Dr. Wilson and from

April 6 to April 10 by Dr. Counts. Tanner also called the Department of Human Services (DHS) hotline on March 31 and was told an investigation would be opened. He requested that Gregersen's custodial periods be suspended until an investigation could be completed.

The White County Circuit Court held an emergency hearing on April 16. At the onset, the court made clear that it was not concerned with "anything that happened prior to the last time we were in court." The court also stated that it was "looking for contempt. And if I hear anybody was guilty of contempt, they're going to jail."

Tanner testified that on March 19, he picked up N.T. from school and took him to practice and that he made contact with Gregersen when practice was over. He stated that he "had been informed that she was driving on a suspended license. And my former Counsel told me to have the police check her license before I released him to her." Tanner testified that when the police showed up, Gregersen got in her car and left. He acknowledged that he did not release N.T. to Gregersen but denied that he had "refused" to return N.T. He explained that he kept N.T. the following week, which was his week for visitation, and that he did not return N.T. on March 30, which was the start of Gregersen's week of visitation. Tanner testified that N.T. was "very upset" about the incident.

Lisa Martin testified that she is a family services worker for DHS with primary duties as a differential-response worker, which means that she takes a report from the hotline that is considered less serious and conducts a home visit, offers services, and assesses the home for any health or safety issues. If there are no health and safety issues, and the

family declines services, then the case is "closed out" without any formal investigation. Here, Martin explained that the hotline received a call on March 31, and that on April 2, she made an unannounced visit to Gregersen's home. Martin observed that the home was clean and that Gregersen was rational and sober. Martin observed no health or safety issues and determined there was no need for further DHS involvement. In her opinion, it was a safe place for N.T.

Jennifer Gregersen testified that she met Tanner at Harps on March 19 to pick up N.T. She described the encounter as follows:

> [W]hen I arrived, they parked in front of the vehicle and then after a few minutes they moved around where they were on the other side of me. So I waited several minutes and I called [N.T.] and I called Michael. . . . [T]hey wouldn't answer. So I got out of the van, walked over to the truck, knocked on the back window where [N.T.] was sitting just, you know, tapped on it. And he didn't roll the window down. So then Michael rolled his window down and he said on the advice of my attorney, you know, I need to know if you have a suspended driver's license. And I said, are you kidding? And he said, no. And so I said, okay, does that mean you're not going to let me take [N.T.]? And he said, not unless I know you don't have a suspended—you know, no, I'm not going to let you take him. So I said, okay and I got in the van and I left.

She acknowledged that she did have a suspended driver's license and should not have been driving that day, but she also explained that her driver's license had been suspended at the time of the last hearing in March and that Tanner knew about it then. She explained that Tanner's visitation over spring break started the next day, March 20, but when she attempted to exercise her next week of visitation on March 30, N.T. was not at school due to illness, and Tanner provided no information to her about N.T.'s medical issues. The only information Gregersen received was from the school in the form of a doctor's note. She denied any alcohol abuse whatsoever and explained that her suspended license

was due to failure to pay a fine. She also said that the last week she had N.T., she caught him lying about his girlfriend, and N.T. became angry that she (Gregersen) had looked through his phone. Gregersen opined that N.T. made up the allegations concerning alcohol abuse partly because he was mad at his mother and partly because Tanner coerced him. Finally, Gregersen agreed that she had a current charge of fraudulent use of a credit card in White County, but again explained that Tanner was aware of that charge at the last hearing in March.

Dr. Counts testified that he saw N.T. on April 6 and that N.T. appeared anxious and distressed. Based on his discussion with N.T., Dr. Counts concluded that there was a possibility that N.T. was in jeopardy and that "this needed to come before the Court for a decision." On cross-examination, he acknowledged that he did not do a full custody evaluation and that he based his recommendation solely on what was reported by N.T.

After the testimony was concluded, the court made the following findings from the bench:

> Ms. Gregersen was, in accordance with the court Decree, to pick up her child at Harps. She went to Harps and she was prevented from picking up her child. The fact that she may have had a suspended driver's license does not negate the terms of the Court Order. The Court Order says she gets visitation. There was nothing to indicate that the child was going to be placed in danger because the mother was obviously intoxicated. In addition, the father knew about this history and this whole thing could have been avoided. . . . [T]o have the child at the location for the pickup and then to refuse to give the child to the mother is in violation of the Court Order.
> . . . .
> I cannot over emphasize how the action of Mr. Tanner is so clearly in violation of this Court's Order and it's done within ninety days, possibly within sixty days, of having appeared in front of this Court and he goes out and he violates the Order. He is in criminal contempt of court.

That same day, April 16, the court entered an order of body attachment to the White County Sheriff directing that Tanner be detained in the White County Detention Center for thirty days.

Tanner filed a motion for stay pending appeal and a notice of appeal on April 17; on April 20, the court entered a written order finding Tanner in criminal contempt and ordering him to serve thirty days at the White County Detention Center. The court also ordered Tanner to pay $1500 toward Gregersen's attorney's fees. Tanner's motion for stay was denied by the court on April 29, and on May 6, Tanner filed an amended notice of appeal from the April 16 and April 20 orders.[1]

Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. *See Ivy v. Keith*, 351 Ark. 269, 92 S.W.3d 671 (2002). Willful disobedience of a valid order of a court is contemptuous behavior. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004). In reviewing cases of criminal contempt, the appellate court views the record in a light most favorable to the trial judge's decision and sustains that decision if it is supported by substantial evidence. *Conlee v. Conlee*, 370 Ark. 89, 257 S.W.3d 543 (2007). Substantial evidence is evidence of a sufficient force and character to compel a conclusion one way or another, forcing the mind to pass beyond suspicion or conjecture. *Id.*; *Witherspoon v. State*, 322 Ark. 376, 909 S.W.2d 314 (1995). Where a person is held in contempt for

---

[1] Tanner filed a motion for release and stay with the Arkansas Supreme Court on 11 May 2015, which was granted on 12 May 2015. In that motion, Tanner explained that he had "already been forced to serve over three-quarters of his sentence"; in his brief, he explains that he has served twenty-seven days of his thirty-day sentence.

failure or refusal to abide by a judge's order, the reviewing court will not look behind the order to determine whether it is valid. *See Conlee, supra.*

For his first point on appeal, Tanner argues that he did not violate the court's order; instead, he asserts, Gregersen voluntarily left without N.T. after being told the police were coming to check her driver's license. Thus, Tanner argues, the court's finding that he refused to allow Gregersen to leave with the child is not supported by substantial evidence. We disagree. The court listened to both parents' testimony, including Gregersen's testimony that Tanner stated he was not going to let her take N.T. This court will not act as a super fact-finder or second-guess the circuit court's credibility determination. *See Lynch v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 149.

For his second point on appeal, Tanner argues that the circuit court's sentence of thirty days' imprisonment and $1500 in attorney's fees was excessive in light of the circumstances. He claims that his actions "involved the direct safety and well being of a twelve-year old child" and that he "took all the necessary steps to protect the safety and well being of his son while seeking immediate intervention from the judicial system." Thus, he asserts, his sentence was excessive and should be modified.

Tanner's argument does not account for the fact that there was no evidence that the child would be placed in danger if transferred to his mother's custody on March 19. The circuit court made this finding below, and if Tanner was concerned about Gregersen's lack of a valid driver's license, he could have raised that issue before the agreed order was entered. Our supreme court has observed that "[i]n contempt cases, the trial court has discretion to fashion the punishment to fit the circumstances." *See Omni*

*Holding*, 356 Ark. at 455, 156 S.W.3d at 239 (citing *Hubbard v. Fleet Mtg. Co.*, 810 F.2d 778, 782 (8th Cir. 1987)).  We hold that there was no abuse of that discretion and affirm.

Affirmed.

GLADWIN, C.J., and GRUBER, J., agree.

*Lightle, Raney, Streit & Streit, LLP*, by: *Susannah R. Streit*, for appellant.

No response.